# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF IDAHO

In re:

**NICHOLAS RYAN LARSON,**

Debtor.

**Bankruptcy Case
No. 20-40001-JMM**

## MEMORANDUM OF DECISION

Appearances:

Alexandra O. Caval, Twin Falls, Idaho, attorney for Debtor.

Kameron M. Youngblood, Idaho Falls, Idaho, former attorney for Debtor.

Andrew Seth Jorgensen and Jason R. Naess, Boise, Idaho, attorneys for United States Trustee.

Gary L. Rainsdon, Twin Falls, Idaho, Chapter 7 Trustee.

### *Introduction*

Before the Court is the United States Trustee's ("UST") motion for Monetary and Injunctive Remedies in this chapter 7[1] case.  Doc. No. 56.  The Court conducted an evidentiary hearing on the motion on October 7, 2021.  The hearing was set for an in-person evidentiary matter in Boise, Idaho.  All parties were present in the courtroom with

---

[1] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, all rule references are to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037, and all "Civil Rule" references are to the Federal Rules of Civil Procedure.

MEMORANDUM OF DECISION – 1

the exception of debtor Nicholas Ryan Larson's ("Debtor") then-attorney, Kameron

Youngblood ("Youngblood").  Youngblood appeared by phone without asking

permission to do so.  The Court ultimately decided to move forward with the hearing with

Youngblood appearing by telephone.  No party objected to the procedure.  Moreover,

Youngblood expressly stated that he did not object to any of the allegations contained in

the UST's motion and apologized to Debtor.  The evidentiary hearing was held, after

which the parties were invited to submit closing arguments.  Doc. Nos. 63–64.  The

motion was then deemed under advisement.

After considering the briefing, testimony, exhibits, and oral argument presented, as

well as the applicable law, the Court issues the following decision which resolves the

motion.  Fed. R. Bankr. P. 7052; 9014.

### *Facts*

Debtor filed a chapter 7 bankruptcy petition on January 1, 2020, through attorney

Youngblood.  Doc. No. 1.  The initial filing included only the petition, Social Security

Statement, Certificate of Credit Counseling, Statement of Domestic Support Obligations,

signature pages, and Disclosure of Compensation of Attorney for Debtor ("Disclosure").

Doc. Nos. 1–6.  The other required documents such as Form 122A-1, the schedules,

Statement of Financial Affairs, Statement of Intent, and the Summary of Assets and

Liabilities did not accompany the petition.

MEMORANDUM OF DECISION − 2

1.  Disclosure of Compensation

Debtor testified Youngblood's office provided two options to pay for Youngblood's bankruptcy services.  First, he could finance Youngblood's fee through an entity called Fresh Start Funding, or second, he could pay in cash and get a discount.  The financing route cost considerably more: the fee was $2,600 if financed, but approximately $1,800 if paid in cash.  Ex. 302 at p. 17.  While Debtor signed the Disclosure on December 30, 2019, indicating he was opting for the financing route, he decided the following day to choose the cash option instead.  Ex. 307.  Youngblood's office then sent him two more Rule 2016(b) disclosure forms, one which indicated a pre-petition payment of $1,700 and one showing the $1,700 payment was received post-petition.  Ex. 309.  When the bankruptcy was filed on January 1, 2020, Youngblood filed the Disclosure with the Court indicating Debtor had chosen the $2,600 financing option.  Ex. 307.  Moreover, Youngblood's efforts to explain the process were apparently lacking, as Debtor testified that he thought the Disclosure was the actual fee agreement, and that he never signed a post-petition fee agreement or contract for Youngblood to represent him that included what services Youngblood would provide and how much it would cost.  Debtor did not remit the $1,700 in cash to Youngblood's office until January 12, 2020.

As required by Rule 2016(b), Youngblood timely filed the Disclosure.  Ex. 307.  The Disclosure indicates that Debtor paid Youngblood nothing prior to the bankruptcy filing, but that the agreed fee was $2,600 "for services rendered or to be rendered on

MEMORANDUM OF DECISION − 3

behalf of the debtor(s) in contemplation of or in connection with the bankruptcy case ….”

*Id.*

The details of the Disclosure are important to the Court's analysis of the UST's

motion, so the Court will recite them here.  It provides that "[i]n return for the above-

disclosed fee, [Youngblood] ha[s] agreed to render legal service for all aspects of the

bankruptcy case, including:

    a. Analysis of the debtor's financial situation, and rendering advice to the debtor in
       determining whether to file a petition in bankruptcy;
    b. Preparation and filing of any petition, schedules, statement of affairs and plan
       which may be required;
    c. Representation of the debtor at the meeting of creditors and confirmation hearing,
       and any adjourned hearings thereof;
    d. [Left open for additional provisions; none were listed].

*Id.*  The Disclosure also provided details about the financial agreement between Debtor

and Youngblood:

    e. Counsel has a line of credit from a third-party lender secured by the assignment to
       the lender of the account receivable owed by Debtor(s).  The financing is not
       factoring and also should not be considered an agreement ot [sic] share
       compensation.  The Lender will have rights to collect payment from the Debtor(s)
       as well as any third party gurantor [sic].  Any such financing will clreay [sic]
       provide that the Debtor(s) are fully informed and must consent to the financing
       and assignment.  The actual loan agreements will be made available upon request
       by a party-in-interest.
    f. Debtor and Attorney have entered into two separate fee agreements.  The first was
       for $0.00, signed pre-petition, for the preparation and filing of the bankruptcy
       petition, and review, analysis and advisement of the typical matters that are
       required to be preformed [sic] pre petition by a bankruptcy attorney under the
       applicable bankruptcy and ethical rules.  Any fees and costs for pre-petition
       services that were unpaid and owing at the time of filing were waived by Counsel.
       The second fee agreement was for $2,600.00, signed post petition for the
       completion of the balance of the schedules, representation at the 341 meeting of
       creditors, and othe [sic] legal servives [sic] outlined in the fee agreement.  The

MEMORANDUM OF DECISION − 4

> post petition agreement allows the Debtor(s) to make payments for up to 12
> months post-petition for the post petition fees.  Counsel's services to the Debtor(s)
> are not unbundled and are instead bifurcated into pre- and post-petition services as
> described in [two cited cases].  Counsel is able to draw funds under its line of
> credit in an amount up to 75% of the post petition fees so long as it assigns the
> post-petition receivable to the lender as collateral, in which event the lender will
> manage the account receivable in accordance with the terms of the line of credit
> agreement.

*Id.*  It is unclear whether the pre-petition or the post-petition fee agreements referenced in

the Disclosure were ever prepared.

Despite the Disclosure providing that $2,600 was the agreed-upon attorney's fee,

Debtor testified that Youngblood's assistant, named Mark, was planning to drive through

Wendell, Idaho where Debtor lived, and arranged to meet with Debtor at a Subway

restaurant in town on January 12, 2020.  At that meeting, Debtor paid Mark the agreed-

upon cash price of $1,700 for Youngblood's bankruptcy services.  Although Youngblood

possessed two additional disclosure of compensation forms that had been executed prior

to the filing which reflected a cash payment and the lower price, he never supplemented

the Disclosure he had previously filed to reflect the cash agreement.  Ex. 309.[2]

---

[2]  The Disclosure filed in this case indicated Debtor agreed to pay $2,600 for Youngblood's services and
included the financing provisions outlined in paragraphs (e) and (f) above.  The two other disclosure
forms Debtor executed reflected the cash price of $1,700. Ex. 309.  One indicated the full amount had
been paid pre-petition, while the other provided the payment was received post-petition.  *Id.*  Both of the
"cash" disclosures also included paragraphs (e) and (f), however, which is the line of credit and financing
language and indicates a total fee of $2,600.  *Id.*

2.  The Attorney–Client Relationship

Debtor's bankruptcy petition was filed on January 1, 2020.  Ex. 318.  At no time prior to the filing or afterward did Youngblood make an effort to meet personally with Debtor.  Most of the communications between the law office and the Debtor were by phone, text, fax, and email, and most often through Youngblood's assistant.  Indeed, the first and only time Debtor ever met Youngblood in person was on February 10, 2020 at the 341 meeting of creditors, but even then he had no private opportunity to speak with him one-on-one.

To facilitate the bankruptcy filing, Debtor faxed a large packet of papers, including tax returns, check stubs, and bank statements to Youngblood's office.  Other times, Debtor used the scanner application on his phone to send information to the law firm, or took photographs of documents and texted them to Youngblood's office.  Some of the communications with Mark at Youngblood's office occurred late at night.  For example, the record includes a series of text messages beginning at 10:07 pm on December 30, 2019 and continuing until 12:36 am the following day.  Ex. 302.  These messages evidence the fact that not only were documents were being sent back and forth between Debtor and Youngblood's office in anticipation of the bankruptcy filing, but that these "conversations" occurred late at night.

3.  Signature Pages

Some of the documents faxed or scanned were signature pages.  The text messages and Debtor's testimony make clear that only the signature pages themselves, and not the

MEMORANDUM OF DECISION − 6

entire documents to which they were attached, were sent to Debtor to sign.  *Id.* at pp. 1–
4.  Debtor admitted at the hearing that when he signed the signature pages, he was unsure
to what documents they belonged.  The text messages make clear that Debtor was given
instructions only about how to get a photograph of the signed signature page back to
Youngblood's office (e.g., by laying the signature page flat, signing it, taking a photo of
the signed document, and sending it back to the same number used to text him).  *Id.*
There was no direction to review the entire documents first, or any offer by Youngblood
to discuss the completed documents with Debtor, or for that matter, to even provide the
complete document to him.  Moreover, while Debtor signed the various signature pages
in wet ink—with a pen—he testified he never sent the hard copy of the signature pages to
Youngblood's office.

This flurry of document exchange between Youngblood's office and Debtor was a
precursor to filing the bankruptcy petition.  Ex. 302 at pp. 1–2.  Debtor testified,
however, that Youngblood never reviewed the bankruptcy petition with him before it was
filed, though he was emailed a copy of the completed petition.

On January 27, 2020, nearly a month post-petition, Youngblood emailed Debtor
and attached signature pages for four additional documents—the Chapter 7 Statement of
Your Current Monthly Income form, the Declaration About an Individual Debtor's
Schedules, the Statement of Financial Affairs for Individuals Filing for Bankruptcy, and
the Statement of Intention for Individuals Filing Under Chapter 7.  Ex. 301.  In the
accompanying email, Youngblood wrote, "[w]e are out of time so please call me when

MEMORANDUM OF DECISION − 7

you can.  Attached below are your signature pages please sign where I have circled and email them back to me ASAP." *Id.*  Debtor testified that only the signature pages were attached to the email and that he did not receive any other portions of the documents, nor did he ask to see them.  He further testified that he signed the signature pages using DocuSign, which the Court understands to be an online document signing program.  He later signed at least some of the documents with wet ink, which were ultimately filed in Debtor's bankruptcy case.  Ex. 311.  Debtor explicitly testified, however, that he was never asked to send the original wet signature pages back to Youngblood's office.  Other documents, specifically the Chapter 7 Statement of Currently Monthly Income and the Statement of Intention for Individuals Filing Under Chapter 7, Debtor testified he only signed using DocuSign and never signed with a pen.  Ex. 301 at pp. 3, 6.

4.  Creditor's Meeting

The § 341(a) meeting of creditors was held on February 10, 2020.  Doc. No. 19. In preparation for that meeting, Debtor testified that Youngblood called him the night before and went over what questions the trustee would ask.  When Debtor answered "yes" to a couple of questions, including to the query about 'whether anyone owes you money,' Debtor testified that Youngblood directed him to answer "no" so the meeting would not take longer than it needed to.  Debtor followed his counsel's advice and answered "no" to those questions at the meeting.

MEMORANDUM OF DECISION – 8

5.  Debtor's Address

The bankruptcy petition filed on January 1, 2020 indicates Debtor's address is 420 5th Ave. W. in Wendell, Idaho. *Id.* at p. 7.  Sometime in January 2020, Debtor testified that he informed Youngblood's office that he cannot receive mail at his physical address but instead his mail must be sent to a post office box.  Youngblood's office never filed the necessary change of address with the bankruptcy court.  On August 26, 2020, Youngblood law office texted Debtor and asked him to update his address, and he reminded them of his post office box.  Ex. 302 at p. 14.

6.  Tax Refund and the Adversary Proceeding

At the January 12, 2020, meeting at Subway with Youngblood's assistant, Mark, Debtor inquired about the status of his tax refund, and specifically whether he would have to give it to the bankruptcy trustee.  He testified he made this inquiry because he had heard from a friend that debtors in bankruptcy sometimes have to give it to the trustee.  According to Debtor's testimony, Mark said that because Debtor was not filing bankruptcy on his own debts[3] for the most part, he should have very little to pay in the bankruptcy, and advised Debtor to make his tax refund "disappear."  Debtor understood

---

[3] Debtor's impetus to file a bankruptcy petition stemmed from his desire to discharge certain debts belonging to his ex-wife, including a judgment.  He testified that Mark informed him the bankruptcy system allowed him to "pick and choose" which debts he sought to discharge.  To facilitate this, Debtor brought a credit report to the January 12 meeting at Subway and indicated to Mark which debts he wanted to discharge and those he wanted to pay by circling some of the debts on the report.  Mark took pictures of the marked-up credit report with his phone so he could refer to it at his office.

MEMORANDUM OF DECISION – 9

that meant he could spend the refund on everyday things like he normally would. Nevertheless, Debtor sent his 2019 tax returns to Youngblood's office on February 16, 2021. Ex. 302 at p. 15. Moreover, he retained the entire tax refund until about the middle of May 2020 when he received the notice of discharge. Because he had not been contacted about turning over the refund and he had received a discharge, he testified that he believed the trustee was not going to ask for it at that point and that the case was "over."

In the meantime, shortly after the bankruptcy petition was filed, the Court issued its standard Income Tax Turnover Order. Doc. No. 12. When Debtor did not turn over his tax refund, on July 31, 2020, Trustee issued a "10-day letter." Ex. 316. The letter was mailed to Debtor at his physical address in Wendell, at which he cannot receive mail. Youngblood's office was also copied on the letter. *Id.* The letter explained that the Income Tax Turnover Order issued by the Court required Debtor to turn over copies of tax returns and tax refunds. *Id.* It further directed that the tax returns and refunds be turned over to Trustee within 10 days of the letter, otherwise the Trustee might commence an adversary proceeding to revoke Debtor's discharge. *Id.*

That same day, Trustee received a copy of Debtor's 2019 tax return.[4] On the other hand, the copy of the 10-day letter sent to the Debtor was returned as undeliverable. Trustee contacted Youngblood's office which provided him with Debtor's post office box

---

[4] The testimony was not clear who sent the tax return to Trustee or whether its receipt was a direct response to his letter or merely a coincidence.

MEMORANDUM OF DECISION − 10

address, to which Trustee resent the letter. It was not returned. On August 31, 2020, Debtor reached out to Youngblood via text in which he referenced Trustee's 10-day letter and confirmed he had already sent the tax return to Youngblood's office. Ex. 302 at pp. 16–17. Debtor continued to text Youngblood's office, who replied and referenced filing an amendment so he could pay it, but Debtor did not understand what that meant. Youngblood's office suggested a quick phone call with Youngblood, but that never occurred. *Id.* at pp. 15–16. Debtor then texted and said he could come up with some and even the full amount of the tax refund, but Youngblood's office never responded to his texts. In January 2021, Debtor had a phone call with Mark who simply said he would get back to him. He messaged Youngblood's office several more times. *Id.* at p. 17. On February 22, 2021, after he had received notice of the filing of the adversary proceeding, Debtor texted both Youngblood directly as well as his office, but after hearing nothing back, he called the trustee directly. *Id.*; Ex. 303.

From the Trustee's perspective, he also attempted to contact Youngblood's office by email on several occasions about the 10-day letter—specifically, on August 5, 2020, September 3, 2020, October 3, 2020, and January 16, 2021. Ex. 312 at p. 3 ¶ vi. In response, Trustee received a couple of emails back from Youngblood which basically asked what the Debtor needed to do, despite the fact that Trustee's emails were clear on that point. Finally, after receiving nothing from Debtor, on January 21, 2021, Trustee commenced the adversary proceeding, *Rainsdon v. Larson (In re Larson)*, 21-08003-

MEMORANDUM OF DECISION − 11

JMM. Ex. 312. Trustee testified that the adversary proceeding would not have been necessary if the Debtor had turned the refund over.

Trustee did not hear from Youngblood following the filing of the adversary complaint, nor did Youngblood take any action in the adversary case. Instead, Trustee received a phone call directly from the Debtor who called to inquire what was going on and how could it be resolved. Because Debtor was represented by Youngblood, Trustee could not work directly with him. He suggested Debtor obtain different counsel, and provided him with several names. Debtor then contracted with Ms. Alexandra Caval to represent him. She entered an appearance in the adversary case on March 9, 2021. Adv. Doc. No. 6. Following her employment, Ms. Caval quickly arranged for Debtor to pay the refund along with the $350 adversary filing fee. Trustee requested that Debtor file an affidavit in the adversary case to explain that Debtor's conduct was not a willful disregard of the Court's income tax turnover order but was instead due to his lack of communication with Youngblood. Following docketing of the affidavit, Trustee filed a motion to dismiss the adversary proceeding on April 16, 2021, and the Court entered an order dismissing the case that same day. Adv. Doc. Nos. 12, 13.

Trustee testified it was his belief that Debtor was always willing to turn the refund over but questioned whether Debtor even knew he needed to do so. Moreover, he testified that if Youngblood had been more responsive to his emails and the tax turnover order, the adversary proceeding would not have been necessary. Ultimately, had Debtor not reached out to him and then contacted Ms. Caval, Trustee testified that he would have

MEMORANDUM OF DECISION − 12

sought a judgment against Debtor for the tax refund amount, the adversary filing fee, as well as a revocation of Debtor's discharge.  Trustee would then have sought to garnish Debtor's wages until the full amount of the judgment was paid.

7.  Funds Outlaid

In addition to the $5,019 tax refund amount Debtor would have been required to remit to Trustee under any circumstances, the adversary complaint also sought a judgment in the amount of $350 for the adversary filing fee.  Ex. 312.  To rectify the situation, Debtor also had to retain Ms. Caval and incurred attorney's fees in the process. Pursuant to their agreement, Debtor testified he agreed to pay Ms. Caval $250 per hour. According to an invoice dated September 6, 2021, Debtor owed Ms. Caval a total of $2,575 for services provided between March 8, 2021—April 19, 2021.  Ex. 305.

### *Motion for Sanctions*

On July 29, 2021, the UST filed a motion for sanctions under §§ 329, 526, the Idaho Rules of Professional Conduct, and this Court's local bankruptcy rule 5003.1, seeking the following:

    a. Cancelation and voidance under §§ 329 and 526(c)(1) of any contract or agreement between Debtor and Youngblood.
    b. Disgorgement of the $1,700 in fees paid by Debtor to Youngblood for his services, plus reimbursement to Debtor of the $350 adversary filing fee under § 329.
    c. Reimbursement to Debtor for Ms. Caval's attorney's fees and costs incurred in defending the adversary proceeding.
    d. Injunctive relief pursuant to § 526(c)(5) for Youngblood's intentional violations of § 526 as follows:

MEMORANDUM OF DECISION − 13

1) Suspension of Youngblood's practice before this Court until (1) he reports what measures he has implemented to ensure his employees are appropriately supervised and are upholding the standards of care expected of an attorney practicing before the Court, and (2) the Court is satisfied with those measures.

2) Require Youngblood to file a "status report" or other document with the Court in each case where he appears as counsel. Such a document should include a client's wet signature and a clear and conspicuous attestation by the client and Youngblood indicating (1) Youngblood personally met and reviewed the Petition, Schedules, SOFA, and other documents with the client prior to filing; (2) the client's questions have been answered regarding the Petition, Schedules, SOFA, and other documents, and the information included therein, and the client is satisfied he or she is receiving adequate representation from Youngblood; and (3) the client provided Youngblood a copy of the wet signatures for the Petition, Schedules, SOFA, and other documents filed in the case. The requirement to file such a report should continue until the Court is satisfied it is no longer necessary.

3) Order the return of fees in any pending or future case filed by Youngblood where it appears the signatures filed on the docket were received by Youngblood's office via email, fax, or some other electronic means.  In other words, where it appears Youngblood may not have obtained wet signatures to retain in his files as required by LBR 5003.1.

e. Imposition of a civil penalty under § 526(c)(5)(B) to deter inclusion of future misleading and untrue statements in documents filed with the Court.

Doc. No. 56.

The Court will first consider whether Youngblood violated any statute, court rule, or Idaho Rule of Professional Conduct and, if violations are identified, the Court will then discuss consequences for such violations.

MEMORANDUM OF DECISION − 14

1.  Did Youngblood violate any statute, Rule, or Rule of Professional Conduct?

In a word, yes.

*A.  Rule 2016*

Rule 2016 governs compensation for services in bankruptcy cases.  Subsection (b) of that rule governs disclosure of compensation paid or promised to debtor's attorney, and provides:

> Every attorney for a debtor, whether or not the attorney applies for compensation, shall file and transmit to the United States trustee within 14 days after the order for relief, or at another time as the court may direct, the statement required by § 329 of the Code including whether the attorney has shared or agreed to share the compensation with any other entity.  The statement shall include the particulars of any such sharing or agreement to share by the attorney, but the details of any agreement for the sharing of the compensation with a member or regular associate of the attorney's law firm shall not be required. A supplemental statement shall be filed and transmitted to the United States trustee within 14 days after any payment or agreement not previously disclosed.

In the case before this Court, there is no question the Rule 2016(b) disclosure Youngblood filed in Debtor's case was inaccurate in several respects.  First, it indicated the Youngblood was charging $2,600 for his services in Debtor's case, of which none was paid pre-petition.  Ex. 307.  In fact, the cash price agreed on was $1,700, which Debtor paid to Youngblood's assistant less than two weeks after the petition was filed.  Next, the Disclosure indicated that Debtor would be financing the attorney's fees and Youngblood would be utilizing a line of credit from a third-party lender.  *Id.*  This is of course incorrect.  Finally, the Disclosure filed with the Court recited that Debtor and Youngblood have entered into two separate fee agreements—one pre-petition for $0, and

MEMORANDUM OF DECISION − 15

one post-petition for $2,600. *Id.* This is also inaccurate, as it does not appear Debtor and Youngblood ever entered into *any* fee agreement. Debtor expressly testified that he believed the 2016(b) disclosures he signed constituted the fee agreement between himself and his counsel.

The Court is aware, of course, that Debtor signed other versions of the Rule 2016(b) disclosure, one of which was accurate at least with regard to the amount paid post-petition for Youngblood's representation in the case. Ex. 309. But that version would never have come to light had the UST not filed the sanctions motion. Even if Youngblood argued that he needed to file a disclosure at the same time he filed the bankruptcy petition and that he understood at the time that Debtor was planning to finance the $2,600 fee, this does not excuse Youngblood's course of conduct. First, Rule 2016(b) provides that the deadline to file the disclosure of compensation form with the Court is 14 days after the filing of the petition. Because the cash was given to Youngblood's assistant on January 12, 2020, Youngblood had a couple of days to file a timely and correct disclosure form. Second, even if he filed the Disclosure on belief that Debtor would finance the $2,600 fee, Rule 2016(b) clearly requires a supplemental disclosure to be filed with the Court and transmitted to the UST within 14 days after any payment or agreement occurred that was different than that previously disclosed. Finally, although not at issue here, it is questionable whether the Disclosure filed with the Court would pass muster under either *In re Castorena,* 270 B.R. 504 (Bankr. D. Idaho 2001) or

MEMORANDUM OF DECISION − 16

*In re Grimmett*, No. BR 16-01094-JDP, 2017 WL 2437231 (Bankr. D. Idaho Jun. 5, 2017), *aff'd* No. 1:17-cv-00266-EJL (D. Idaho Feb. 16, 2018).[5]

### B. *Idaho Rules of Professional Conduct*

The Idaho Rules of Professional Conduct apply to attorneys practicing before this Court. Local Bankruptcy Rule 9010.1(g) provides that the "members of the bar of this court shall adhere to the Rules of Professional Conduct promulgated and adopted by the Supreme Court of the State of Idaho." *Grimmett*, 2017 WL 2437231 at *5. The Court will examine some of those rules in its decision.

The scope of the Idaho Rules of Professional Conduct provides guidance to the Court:

> Some of the Rules are imperatives; cast in the terms "shall" or "shall not." These define proper conduct for purposes of professional discipline. Others, generally cast in the term "may," are permissive and define areas under the Rules in which the lawyer has discretion to exercise professional judgment. No disciplinary action should be taken when the lawyer chooses not to act or acts within the bounds of such discretion. Other Rules define the nature of relationships between the lawyer and others. The Rules are thus partly obligatory and disciplinary and partly constitutive and descriptive in that they define a lawyer's professional role. Many of the Comments use the term "should." Comments do not add obligations to the Rules but provide guidance for practicing in compliance with the Rules.

---

[5] An Idaho bankruptcy court in *In re Castorena* prohibited the practice of "unbundling" legal services, holding that when an attorney agrees to represent a client in a bankruptcy case, that attorney agrees to provide a number of fundamental services such as filing schedules, appearing at the § 341 meeting of creditors, and other services. 270 B.R. at 530. The *Grimmett* court reaffirmed that holding. 2017 WL 2437231, at *6–7.

MEMORANDUM OF DECISION − 17

Idaho Rule of Professional Conduct "Scope."

### i. Idaho Rule of Professional Conduct 1.2

This rule governs the scope of representation.  In relevant part, it provides:

> A lawyer shall not counsel a client to engage, or assist a client, in conduct that the lawyer knows is criminal or fraudulent, but a lawyer may discuss the legal consequences of any proposed course of conduct with a client and may counsel or assist a client to make a good faith effort to determine the validity, scope, meaning or application of the law.

The UST alleges that Youngblood's representation of Debtor is deficient under this rule in two instances: 1) Youngblood's assistant's advice to Debtor to make the tax refund "disappear," and 2) Youngblood's coaching of answers for the § 341(a) meeting of creditors.

The Court agrees in both instances that the advice given was unethical.  The inclusion of tax refunds in property of the bankruptcy estate is clear, made especially so by the Court's income tax turnover order.  The advice from Youngblood's office to make the refund "disappear" is in flagrant disregard of both the Court's order and the Bankruptcy Code.  What is less clear, however, is whether Mark's poor advice is attributable to Youngblood.  The Court will discuss this issue below in connection with Idaho Rule of Professional Conduct 5.3, which governs an attorney's responsibility over non-lawyer assistants.

The advice prior to the meeting of creditors is also concerning.  That meeting is conducted by placing the debtor under oath and then asking specific questions about his or her assets and obligations.  To advise a debtor to answer in a particular manner without

MEMORANDUM OF DECISION − 18

regard to the truth of the answer is to counsel the debtor to commit perjury.  There is no

question such a practice violates Idaho Rule of Professional Conduct 1.2.

### ii.  Idaho Rule of Professional Conduct 1.3

Idaho Rule of Professional Conduct 1.3 provides that a lawyer "shall act with

reasonable diligence and promptness in representing a client."  A portion of paragraph 3

of the Commentary to this rule is worth repeating here:

> Perhaps no professional shortcoming is more widely resented than
> procrastination.  A client's interests often can be adversely affected by the
> passage of time or the change of conditions; in extreme instances, as when
> a lawyer overlooks a statute of limitations, the client's legal position may
> be destroyed.  Even when the client's interests are not affected in substance,
> however, unreasonable delay can cause a client needless anxiety and
> undermine confidence in the lawyer's trustworthiness.

Youngblood demonstrated a lack of diligence in several respects.  First, Debtor

informed Youngblood's office of his mail situation, indicating the fact that the post office

box must be used or he would not receive mail.  Yet, Youngblood never corrected the

Debtor's address on the docket.  Indeed, only when Ms. Caval became Debtor's counsel

was his address amended on the Court's docket.  As a result, Debtor did not receive the

Court's tax turnover order or the Trustee's original 10-day letter.  Given Debtor's

demonstrated willingness to pay over the tax refund, it appears the entire adversary

proceeding, with its attendant costs, could have been avoided by Youngblood's diligence.

Moreover, once the adversary proceeding was commenced, Debtor's willingness

to address the issue leads the Court to believe that Youngblood could have likewise

quickly resolved the matter had he acted more diligently.

MEMORANDUM OF DECISION − 19

The Commentary further provides that a lawyer "must also act with commitment and dedication to the interests of the client and with zeal in advocacy upon the client's behalf." Youngblood's practice, at least in this case, of turning over much of the handling of Debtor's case to his employee, demonstrates a lack of diligence on his part. In some respects, Mark was patently incorrect in his understanding of the law and procedures of the bankruptcy court. By turning over so much responsibility to his staff without proper training or oversight, Youngblood's commitment and dedication to Debtor's interests was demonstrably lacking. For these reasons, the Court concludes Youngblood violated Idaho Rule of Professional Conduct 1.3.

### iii.  Idaho Rule of Professional Conduct 1.4

Turning to the communication between attorney and client, Idaho Rule of Professional Conduct 1.4 provides that a lawyer shall:

> (1) promptly inform the client of any decision or circumstance with respect to which the client's informed consent, as defined in Rule 1.0(e), is required by these Rules;
> (2) reasonably consult with the client about the means by which the client's objectives are to be accomplished;
> (3) keep the client reasonably informed about the status of the matter;
> (4) promptly comply with reasonable requests for information; including a request for an accounting as required by Rule 1.5(f); and
> (5) consult with the client about any relevant limitation on the lawyer's conduct when the lawyer knows that the client expects assistance not permitted by the Rules of Professional Conduct or other law.

Idaho Rule of Professional Conduct 1.4 further provides that a lawyer "shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation." Idaho Rule of Professional Conduct 1.4(b).

MEMORANDUM OF DECISION – 20

The evidentiary record before the Court plainly demonstrates a lack of communication between Youngblood and Debtor.  In several instances, Debtor's request to Youngblood's office or to Youngblood himself asked "what's going on?"  Ex. 302 at pp. 16–17.  Sometimes he received a response similar to, "I'll call you later today," but other times he received no response at all.  *Id.*  On numerous occasions he did not receive a call later that day, evidenced by the fact that he asked what was going on again the next day or a few days later.  It is also clear that Debtor never received regular updates about the status of his case.  Paragraph 4 of the Commentary provides:

> A lawyer's regular communication with clients will minimize the occasions on which a client will need to request information concerning the representation.  When a client makes a reasonable request for information, however, paragraph (a)(4) requires prompt compliance with the request, or if a prompt response is not feasible, that the lawyer, or a member of the lawyer's staff, acknowledge receipt of the request and advise the client when a response may be expected.  A lawyer should promptly respond to or acknowledge client communications.

It is evident Youngblood's communication with Debtor fell short of the expectations set by the Idaho Rules of Professional Conduct.

### iv.  Idaho Rule of Professional Conduct 3.3

Idaho Rule of Professional Conduct 3.3 governs an attorney's candor toward the court, and provides that a lawyer shall not knowingly:

> (1) make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer

MEMORANDUM OF DECISION − 21

As described above, the Disclosure filed with the Court was false. This fact alone is sufficient to find a violation of Idaho Rule of Professional Conduct 3.3. The UST further argues that Youngblood's office sought Debtor's signature on various documents without providing the entire document to Debtor for his review, and then filed those documents, which runs afoul of Idaho Rule of Professional Conduct 3.3(a)(3), which provides that a lawyer shall not knowingly:

> (3) offer evidence that the lawyer knows to be false. If a lawyer, the lawyer's client, or a witness called by the lawyer, has offered material evidence and the lawyer comes to know of its falsity, the lawyer shall take reasonable remedial measures, including, if necessary, disclosure to the tribunal. A lawyer may refuse to offer evidence, other than the testimony of a defendant in a criminal matter, that the lawyer reasonably believes is false.

Certain documents filed in a bankruptcy case require a signature of the debtor under penalty of perjury. For example, the petition contains the following verbiage above the signature line: "I have examined this petition, and I declare under penalty of perjury that the information provided is true and correct." Exs. 308; 318 at p. 11. It also acknowledges potential consequences of inaccuracies when it provides, "I understand making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $250,000, or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571." *Id.* In similar fashion, Debtor's schedules are filed with an official Declaration About an Individual Debtor's Schedules, which provides, "Under penalty of perjury, I declare that I have read the summary

MEMORANDUM OF DECISION − 22

and schedules filed with this declaration and that they are true and correct." Ex.

311. The Statement of Financial Affairs contains similar declarations and

warnings. *Id.* at p. 2.

The evidence establishes that Debtor signed the signature pages without

having an opportunity to review the entire document at the direction of

Youngblood's office. In some instances, Debtor was asked to sign the pages late

at night and was told to hurry. Ex. 302. As such, Youngblood knew the

declarations and other assertions in connection made with Debtor's signatures

were false and misleading. While this did not necessarily provide the Court with

inaccurate information, it did leave the Debtor in a terrible position, having

asserted under penalty of perjury that the documents were accurate, despite having

never reviewed them. While some of the burden is on Debtor himself for not

insisting on reading them, the texts from the Youngblood law office urged him to

get them signed because they were out of time. Youngblood's filing of those

documents violated Idaho Rule of Professional Conduct 3.3.

<u>v. Idaho Rule of Professional Conduct 5.3</u>

Idaho Rule of Professional Conduct 5.3 defines a lawyer's responsibility over non-

lawyer assistants. It provides in relevant part:

> With respect to a nonlawyer employed or retained by or associated with a
> lawyer:
>> (b) a lawyer having direct supervisory authority over the nonlawyer
>> shall make reasonable efforts to ensure that the person's conduct is
>> compatible with the professional obligations of the lawyer; and

MEMORANDUM OF DECISION – 23

(c) a lawyer shall be responsible for conduct of such a person that would be a violation of the Rules of Professional Conduct if engaged in by a lawyer if:

(1) the lawyer orders or, with the knowledge of the specific conduct, ratifies the conduct involved; or

(2) the lawyer is a partner or has comparable managerial authority in the law firm in which the person is employed, or has direct supervisory authority over the person, and knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action.

The Commentary provides that a lawyer "must give such assistants appropriate instruction and supervision concerning the ethical aspects of their employment … and should be responsible for their work product.  The measures employed in supervising nonlawyers should take account of the fact that they do not have legal training and are not subject to professional discipline."

In the case at bar, Youngblood had direct supervisory authority over his assistant, Mark.  While there was no testimony elicited regarding Youngblood's efforts to ensure that Mark's conduct was compatible with professional obligations, it is certainly clear that his assistant's conduct fell short.  Youngblood conducted an initial consultation with Debtor, and then apparently left Mark to do the rest.  Youngblood had a brief phone call with Debtor the night before the meeting of creditors, but never went over the completed schedules with him.  Moreover, Mark's bad advice—to make the tax refunds disappear—had the potential to cost Debtor his discharge and was a suggestion to violate an order of the Court.  Finally, Mark's advice that Debtor could "pick and choose" which debts to discharge was completely unfounded and, in some fashion, undermined the very purpose

MEMORANDUM OF DECISION − 24

for which Debtor filed the bankruptcy petition.  In all of this, Youngblood was nowhere to be seen.  The record contains no evidence that Youngblood made reasonable efforts to ensure Mark's conduct complied with the Idaho Rules of Professional Conduct, and because he electronically filed the various documents knowing he had not explained them to Debtor, Youngblood ratified Mark's work.

C. *Local Bankruptcy Rules and Procedures*

Local Bankruptcy Rule 5003.1 governs electronic case filings.  According to this local rule, all documents to be filed in a bankruptcy case are to be filed electronically. LBR 5003.1(c).  Original documents are to be retained by the filing party "for a period of not less than the maximum allowed time to complete any appellate process, or the time the case of which the document is a part, is closed, whichever is later."  LBR 5003.1(e). The local rule also provides that the electronically filed document "shall be produced upon an order of the court."  *Id.*  Subsection (j) of the local rule addresses signatures.  It provides "[t]he electronic filing of any document by a Registered Participant shall constitute the signature of that person for all purposes provided in the Federal Rules of Bankruptcy Procedure.  For instructions regarding electronic signatures, refer to the ECF Procedures."  LBR 5003.l(j).  In turn, the "ECF Procedures" referred to are located on this Court's website.  *See* LBR 5003.1(b).  Paragraph 13A of the ECF Procedures document provides:

> A Registered Participant filing a Verified Pleading [a pleading in which a person verifies, certifies, affirms or swears under oath or penalty of perjury concerning the truth of matters set forth in that pleading or document]

MEMORANDUM OF DECISION − 25

electronically shall insure the electronic version conforms to the original, signed pleading/document.  Each signature on the original, signed pleading/document shall be indicated on the electronically filed Verified Pleading with the typed name on the signature line of the person purported to have signed the pleading/document.  *The electronic filing of a Verified Pleading constitutes a representation by the Registered Participant that he or she has the original, signed document in his or her possession at the time of filing.*  The Registered Participant shall retain the Verified Pleading for a period of not less than the maximum allowed time to complete any appellate process, or the time the case or Adversary Proceeding of which the document is a part, is closed, whichever is later. The document shall be produced upon an order of the Court.

(emphasis added).  The ECF Procedures then instruct attorneys to submit a scanned pdf copy of the original signature page of the original and any amended petition, schedules, and statement of financial affairs to the clerk at the same time as the electronic version is filed.  ECF Procedures, at ¶ 13B.  Finally, the ECF Procedures provide that the "original of all conventionally signed documents shall be retained pursuant to Dist. Idaho Loc. Civ. R. 5.1(3) or LBR 5003.1(e)."  *Id.* at ¶ 19.

The testimony before this Court establishes that Debtor did not sign any of the documents before Youngblood.  The actual wet signatures were obtained by text, fax, or email after Youngblood's office electronically transmitted the signature pages—and *only* the signature pages—to Debtor, who printed them out, signed them, and either photographed or scanned them, and then emailed or texted the photos or scans back to Youngblood's office.  Finally, Debtor testified that

MEMORANDUM OF DECISION − 26

neither Youngblood nor anyone from his office ever asked Debtor to physically

send in the hard copies of the wet signature pages.

According to the ECF Procedures, when Youngblood placed a "/s/ Nicholas

Larson" on the signature lines of the petition, schedules, and statement of financial

affairs and filed them electronically, he represented that he physically had the

original, signed documents in his possession at the time of filing.  In fact, he did

not.  A case in this district previously held that "an attorney's electronic

submission of a document to the Court inaccurately 'purporting to have [Debtor's]

signature is no different than [counsel] physically forging [Debtor's] signature and

handing the [document] over the counter to the clerk.'"  *In re Hurd*, 2010 WL

3190752 at *3 (Bankr. D. Idaho Aug. 11, 2010) (quoting *In re Wenk*, 296 B.R.

719, 725 (Bankr. E.D. Va. 2002)).  Moreover, in interpreting these procedures, the

Court has held that an electronic signature, for example, by DocuSign, is not

sufficient.  *In re Grimmett*, 2017 WL 2437231 at *11.  In short, the Court finds

that Youngblood violated LBR 5003.1 and the Court's ECF Procedures.

2.  Sanctions

The UST argues these various ethical and procedural missteps justify relief under

§§ 329 and 526(a)(2), as well as injunctive relief, and in his motion seeks a number of

sanctions.  The Court will consider each independently.

MEMORANDUM OF DECISION − 27

### A.  Cancelation of the attorney–client contract

The UST seeks to void or cancel the contract of employment between Youngblood and Debtor pursuant to §§ 329 and 526(c)(1).  Section 329 requires an attorney to disclose the amount of all compensation "paid or agreed to be paid, if such payment or agreement was made after one year before the date of the filing of the petition, for services rendered or to be rendered in contemplation of or in connection with the case …."  Those disclosure requirements are implemented through Rule 2016(b), which requires a statement of compensation to be filed within fourteen days after the order of relief.

Section 329(b) provides that if the compensation paid to a debtor's counsel exceeds the reasonable value for the services provided, "the court may cancel any such agreement, or order the return of any such payment, to the extent excessive …."  Courts interpreting this provision have looked beyond the quantity of fees charged and used it to redress other issues with the attorney client relationship.  *See e.g., In re Grimmett,* 2017 WL 2437231, at *9 (fees deemed excessive because fee agreement and collection measures created conflict of interest); *Hale v. United States Trustee (In re Basham),* 208 B.R. 926, 932 (9th Cir. BAP 1997) (the record "supports the bankruptcy court's finding that the fees were unreasonable given the … failure to provide competent and complete representation of the [debtors]); *In re Martin*, 197 B.R. 120, 126 (Bankr. D. Colo. 1996) ("The compensation to be paid to an attorney can be deemed excessive for a host of reasons, including but not limited to an attorney's failure to perform agreed upon services,

MEMORANDUM OF DECISION − 28

failure to comply with the disclosure requirements, the existence of conflicts of interest,

and the like.").

Considering the inaccurate Disclosure filed with the Court, Youngblood had

ample opportunity to file a correct disclosure in the first instance, or to amend it once the

deal changed.  This failure is sufficient grounds for this Court to find Youngblood's fees

were excessive in this case and to cancel the fee agreement.  The nature of the attorney–

client relationship in this case, with Youngblood having very little interaction with his

client and his untrained assistant doing the bulk of the work and providing harmful

advice, is another reason to deem the fees charged excessive and to cancel the contract.

### B. Disgorgement of fees paid to Youngblood and reimbursement for adversary filing fee

The Bankruptcy Code's disclosure requirements are mandatory, and courts have

held that an attorney who fails to comply with those requirements forfeits any right to

receive compensation.  *Hale*, 208 B.R. at 930–31 (citing *Peugeot v. United States Trustee*

*(In re Crayton),* 192 B.R. 970, 981 (9th Cir. BAP 1996)).  Once the bankruptcy court

determines that an attorney has violated § 329 and Rule 2016, the bankruptcy court has

the authority to order the attorney to disgorge all of the attorney's fees.  *Hale,* 208 B.R. at

931; *In re Blackburn*, 448 B.R. 28, 43 (Bankr. D. Idaho 2011) ("The state of the law is

clear—an attorney who neglects to meet the disclosure requirements of § 329(a) and Rule

2016(b), even if inadvertently, forfeits the right to receive compensation for services

rendered and may be ordered to return fees already received.").  Indeed, the Tenth Circuit

MEMORANDUM OF DECISION − 29

has held that "full disgorgement is [not] always appropriate for failure to disclose under §

329[,] [b]ut it should be the default sanction, and there must be sound reasons for

anything less." *SE Prop. Holdings, LLC v. Steward (In re Stewart)*, 970 F.3d 1255, 1267

(10th Cir. 2020).  The Ninth Circuit has held that even negligent or inadvertent failure to

fully disclose relevant information under Rule 2016 may result in denial of requested

fees. *Neben & Starrett, Inc. v. Chartwell Fin. Corp. (In re Park–Helena Corp.)*, 63 F.3d

877, 882 (9th Cir. 1995).  Finally, the caselaw is clear that filing an inaccurate disclosure

statement "is appropriate basis for the total disallowance of compensation by counsel."

*Grimmett*, 2017 WL 2437231 at *10; *see also Hale*, 208 B.R. at 931; *Law Offices of*

*Nicholas A. Franke v. Tiffany (In re Lewis)*, 113 F.3d 1040, 1045–46 (9th Cir.

1997); *Park–Helena Corp.*, 63 F.3d at 881–82.  Here, Youngblood's Disclosure was

grossly inaccurate, and provides grounds for disgorgement of the fee paid to him in this

case.

The failure to obtain and retain Debtor's wet signatures on various documents

filed with the bankruptcy court is further grounds for disgorgement.  As noted above, the

local rule provides that Debtor's counsel must retain "the original of all conventionally

signed documents that are electronically filed" for a specified period and shall be

produced if the court so orders.  In *Grimmett,* the court found counsel had misrepresented

to the court because "when an attorney submits an electronically signed document to the

Court, 'he is certifying to the court that he has the [document] in his physical possession

bearing the original signature of the [party].  If the certification is false, the attorney is

MEMORANDUM OF DECISION − 30

subject to sanctions pursuant to Rule 9011.'" *Grimmett*, 2017 WL 2437231, at *11 (quoting *In re Daw*, 2011 WL 231362 at *6 (Bankr. D. Idaho January 24, 2011) (quoting *In re Tran*, 427 B.R. 805, 808 (Bankr. N.D. Cal. 2010))).  The case before this Court presents another version of *Grimmett*.  In that case, the signatures were computer-generated; here, most, though not all, of the signatures were properly wet ink, but Youngblood never obtained or retained them in accordance with the local rule.

The *Grimmett* court was asked to sanction under Rule 9011.  While it did not do so, it concluded that the attorney's failure to comply with the original signature rules diminished the value of its services and the court stated, "the value of a lawyer's services to a debtor is reduced to nothing, or next to nothing, if those efforts include advising the debtor to violate an order of the Court and a Local Rule." *Id.* at *11–12.  It then cancelled the fee agreement and ordered disgorgement of fees paid to the attorney under § 329. *Id.* at *9.  The same analysis is applicable to the facts before this Court with regard to the wet signature requirements.  Moreover, Youngblood's assistant's advice to the Debtor to make the tax refund "disappear" clearly constitutes advice to violate a court order, and similarly provides grounds for cancelation of the fee agreement and disgorgement of all fees paid to Youngblood for his services. *Id.* at *12.  Here, there is no evidence that Youngblood made reasonable efforts to review Mark's work to ensure compliance with the Code, Rules, and Idaho Rules of Professional Conduct, yet he electronically filed the various documents, and thus essentially accepted Mark's work as his own.

MEMORANDUM OF DECISION – 31

Regarding the filing fee paid in this case, the Court will give credit where credit is due.  It appears the filing fee was paid through the Court's Electronic Case Filing system rather than by the Debtor.  Doc. No. 13.  There is no question Youngblood got the petition filed and Debtor ultimately received a discharge of his debts.  As such, Debtor has received the benefit of the filing and the Court will not order disgorgement of the $335 filing fee.

*C. Reimbursement for Ms. Caval's fees and costs in the adversary proceeding*

The UST also seeks, as a sanction, reimbursement for the costs and fees Debtor had to pay as part of the adversary proceeding.  The Court concludes this is a proper sanction under these facts.  The evidence comfortably establishes that the adversary proceeding was entirely avoidable.  First, Debtor never received the Court's income tax turnover order due to Youngblood filing an incorrect mailing address for Debtor with the Court.  While the Court can only speculate, it seems likely that had Debtor received that order, he would have paid his tax refund to the trustee.  Very early in the case Debtor independently inquired of Youngblood's assistant whether turnover of the refund would be required, and then received such shockingly bad advice.  Moreover, Debtor testified that he retained the full refund for over five months just in case Trustee was going to ask for it, and only spent some of it after he received his notice of discharge and mistakenly believed the bankruptcy case was over.  Second, when the adversary proceeding was ultimately commenced, Debtor immediately sought out the services of his attorney, and when his efforts proved futile, he called Trustee directly to see what could be done.  He

MEMORANDUM OF DECISION − 32

eventually retained competent counsel to assist him and quickly agreed to pay the full amount of the refund plus filing fees.  In fact, Ms. Caval filed an appearance in the adversary proceeding on March 9, 2021, and the motion to dismiss was filed on April 16, 2021.  Ex. 317.[6]

As such, the Court concludes Debtor would have complied with the income tax turnover order in the first place had he been aware of it, obviating the need for the adversary proceeding.  Since Youngblood's representation was ineffective, and frankly largely nonexistent, Debtor was forced to incur significant extra expenses.  These include the $350 filing fee, as well as the fees incurred by Ms. Caval, which total $2,575 as of September 6, 2021.[7]  Ex. 305.  The Court concludes that under these circumstances, Ms. Caval's fees are properly awarded as a sanction.

### D.  Imposition of injunctive relief

Finally, the UST seeks several forms of injunctive relief in Youngblood's cases going forward.  While these would not make the Debtor whole, they might serve to protect other similarly situated individuals in need of bankruptcy assistance as well as to

---

[6] While Ex. 317 was not admitted into evidence, the UST's counsel requested that the Court take judicial notice of those specific dates from that exhibit, which request was granted.

[7] Those fees are undoubtedly substantially higher today, as the Court has conducted several hearings since Ms. Caval filed her fee invoice in this case, one of which lasted the better part of a day.  If a timely additional request for fees is filed, the Court will review it and determine if the fees are reasonable under the Bankruptcy Code and the facts of this case.

provide guard rails for Youngblood's practice so as to bring it into compliance with the Code, Rules, and Idaho Rules of Professional Conduct.

The Supreme Court has made it clear that an Article III federal court has the inherent power "to control admission to this bar and to discipline attorneys who appear before it." *Chambers v. NASCO, Inc.,* 501 U.S. 32, 43 (1991).  The Ninth Circuit recognizes that bankruptcy courts also "have the inherent power to sanction that *Chambers* recognized exists within Article III courts."  *Caldwell v. Unified Cap. Corp.* (*In re Rainbow Mag., Inc.*), 77 F.3d 278, 284 (9th Cir. 1996); *see also In re Aleman*, No. 14-00606-TLM, 2015 WL 1956271, at *1–2 (Bankr. D. Idaho Apr. 29, 2015); *In re Hurd,* 2010 WL 3190752, at *2 ("A bankruptcy court has the authority to regulate the practice of lawyers who appear before it.  Such authority stems from the court's inherent powers, the Code and the Rules."); *Gardner v. Law Office of Lyndon B. Steimel (In re Valentine),* 2014 WL 1347229, at * 3 (Bankr. D. Idaho Apr. 3, 2014) ("The BAP recognized that, under Ninth Circuit precedent, the bankruptcy courts have the power to sanction under their civil contempt authority under § 105(a) and under their inherent sanction authority." (internal quotations omitted)).

These inherent powers are not without limits, however.  "Because of their potency, inherent powers must be exercised with restraint and discretion." *Chambers*, 501 U.S. at 44.  Thus, like the bankruptcy court's civil contempt authority, inherent sanction authority "does not authorize significant punitive damages."  *Knupfer v. Lindblade (In re Dyer),* 322 F.3d 1178, 1197 (9th Cir. 2003) (noting that the Ninth

MEMORANDUM OF DECISION − 34

Circuit has "refrained from authorizing a punitive damage award under the bankruptcy court's inherent sanction authority"). "Civil penalties must either be compensatory or designed to coerce compliance." *Dyer,* 322 F.2d at 1192 (citing *F.J. Hanshaw Enters., Inc. v. Emerald River Dev., Inc.,* 244 F.3d 1128, 1137–38 (9th Cir. 2001)).

When there is bad-faith conduct in the course of litigation that could be adequately sanctioned under the Rules, the court ordinarily should rely on the Rules rather than the inherent power. But if in the informed discretion of the court, neither the statute nor the Rules are up to the task, the court may safely rely on its inherent power. *Chambers*, 501 U.S. at 50.

Initially, the Court notes that it is possible Youngblood no longer intends to practice law. He indicated at the hearing on this motion that his practice had "lost control" of his practice and he asked to withdraw from the cases in which the sanctions motions had been filed.[8] Moreover, since the hearing, the Court has been informed that Youngblood has not paid his annual dues to the Idaho State Bar Association, and on March 14, 2022, he was suspended from the practice of law. As a result, this Court issued a reciprocal notice of suspension and turned off Youngblood's electronic filing privileges. Nevertheless, operating on the assumption that Youngblood will one day return to practicing law, the Court will consider the UST's request for injunctive sanctions.

---

[8] Subsequent to the filing of the sanctions motion at issue here, the UST filed similar motions in 44 other open cases filed by Youngblood that were then pending before this Court.

MEMORANDUM OF DECISION – 35

In the motion, the UST seeks several forms of injunctive relief. The Court will consider each. First, the UST requests suspension of Youngblood's practice before this Court until he reports what measures he has implemented to ensure his employees are receiving proper training, supervision, and are upholding the required standards of care, and the Court is satisfied with those measures. At present this is moot, as Youngblood currently has no filing privileges. However, the Court agrees that Youngblood's training and supervision of his employees, or lack thereof, was a large part of the fact pattern harming Debtor and giving rise to the sanctions motion in this case. Should Youngblood return to the practice of law before the bankruptcy courts in this District, the Court will require a detailed report describing how each non-lawyer employee in his office is trained in legal matters, a description of that employee's duties, and how he or she will be supervised. The Court will require this status report to be updated and filed semi-annually for the first two years following Youngblood's return to practice before the bankruptcy court. Such reports should be provided to both the UST and the Court.

Next, the UST seeks to require Youngblood to file a "status report" or other document with the Court in each case where he appears as counsel, for as long as the Court deems necessary. This report is intended to provide guard rails to channel Youngblood's practice to conform with the Code, Rules, and the Idaho Rules of Professional Conduct. Specifically, the UST envisions this report to include what is essentially an affidavit of the debtor, with a wet signature, as well as a certification by Youngblood indicating:

MEMORANDUM OF DECISION − 36

1) that Youngblood personally met and reviewed the Petition, Schedules, Statement of Financial Affairs, and other documents with the debtor prior to filing;

2) that the debtor has had his or her questions answered and is satisfied with Youngblood's representation; and

3) that the debtor has provided, and Youngblood will retain, copies of the wet signatures filed in the case.

The Court concludes most of these provisions are appropriate. The requirement to provide the debtors' wet signatures in all cases for a time will ensure Youngblood has reformed this problem with his practice. Moreover, a statement from both Youngblood and his clients that Youngblood has met with the client and reviewed all important documents prior to filing will serve to align his new practice with his legal and ethical obligations.

Next, the UST's request for a statement from the debtor that his or her questions have been answered and he or she is satisfied with Youngblood's representation is well-meaning, but the Court does not find it appropriate. Instead, the Court will order that the client provide a statement that he or she has had a reasonable opportunity to converse with Youngblood and to ask questions, and that Youngblood has responded to those questions. The Court will not require that every client be "satisfied" with Youngblood's representation, however. The Court understands that client satisfaction is dependent on many different factors, and that counsel may be doing an excellent job and complying with all statutes, Rules, and Idaho Rules of Professional Conduct, yet the client could remain unsatisfied for some reason. Thus, the Court will not order this relief.

MEMORANDUM OF DECISION − 37

Finally, the UST seeks an order of disgorgement in any pending or future case filed by Youngblood where it appears the signatures filed on the docket were received by Youngblood's office via email, fax, or some other electronic means. At the hearing on this motion, the Court declined to impose such a blanket sanction, and instead asked the UST to file a sanctions motion in any pending case where he believes the documents justify this relief, including in future cases. As such, the Court may consider each case on its own merits.

### E. Imposition of a civil penalty

Lastly, the UST seeks the imposition of a civil penalty under § 526(c)(5)(B) to deter the inclusion of future misleading and untrue statements in documents filed with the Court. While the civil penalty may be justifiable, the Court finds it unnecessary as a deterrent here. By this decision and the corresponding Judgment, the Court will require both disgorgement of the fees paid in this case and the adversary proceeding, as well as significant record keeping and reporting requirements in future cases. These measures are designed to curtail Youngblood's cavalier approach to the practice of law and ensure that his future practice conforms to applicable statutes, Rules, and Professional Rules. As such, an additional deterrent in the form of a civil penalty is unwarranted here.

### Conclusion

The evidence and testimony presented support a finding that Youngblood's representation of Debtor in this case violated the Bankruptcy Code and Rules, local bankruptcy rules, and the Idaho Rules of Professional Conduct and justify sanctions in

MEMORANDUM OF DECISION − 38

this case.  Specifically, the Court concludes that any employment contract between

Youngblood and Debtor should be cancelled and all fees paid by Debtor to Youngblood

should be disgorged, with the exception of the filing fee.  Additionally, as a sanction,

Youngblood shall reimburse Debtor for the $350 adversary filing fee Debtor was required

to remit to the Trustee in order to secure dismissal of the adversary proceeding.

Moreover, Ms. Caval's fees incurred in representing Debtor both in the adversary hearing

and in participating in this sanctions hearing will be paid by Youngblood as a sanction, to

the extent the Court determines they are reasonable.  Furthermore, the Court will impose

specific injunctive relief designed to curtail certain omissions and practices of

Youngblood evidenced by his conduct in this case.  Finally, the Court declines to impose

a civil penalty.

DATED:  May 4, 2022

_____

JOSEPH M. MEIER
CHIEF U. S. BANKRUPTCY JUDGE

MEMORANDUM OF DECISION − 39